UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

KEVIN JAMES CONSTANTINE                  CIVIL ACTION NO. 6:15-cv-02704

VERSUS                                   JUDGE DOHERTY

U.S. COMMISSIONER,                       MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for the payment of benefits.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Kevin James Constantine, fully exhausted his administrative

remedies prior to filing this action in federal court.  The claimant filed an application

for disability insurance benefits ("DIB") and for a period of disability in 2010,

alleging disability beginning on April 21, 2010.[1]  After his application was denied,[2]

an administrative hearing was held before Administrative Law Judge ("ALJ") Gary

---

[1]        Rec. Doc. 15 at 273.

[2]        Rec. Doc. 15 at 11.

L. Vanderhoof in July 2011.[3]  An unfavorable decision was issued in August 2011,[4]

and in October 2012, the Appeals Council denied the claimant's request for review.[5]

The claimant then sought judicial review of the adverse decision.  In April 2014, the

court remanded the claimant's 2010 application to the Commissioner for further

administrative action, with instructions for the ALJ to apply the proper standard in

weighing the treating physician's opinions.[6]

While the judicial review was ongoing, the claimant filed a second application

for DIB and an application for Supplemental Security Income ("SSI").[7]  A second

administrative hearing was held,[8] and in February 2014, ALJ Lawrence T. Ragona

issued an unfavorable decision.[9]  In July 2014, the Appeals Council vacated the

February 2014 decision, vacated the August 2011 decision, ordered that all of the

claimant's applications be associated, and ordered that a new decision be issued on

---

[3]      Rec. Doc. 15 at 136-190.

[4]      Rec. Doc. 15 at 15-669.

[5]      Rec. Doc. 15 at 28.

[6]      Rec. Doc. 15 at 34-55.

[7]      The record contains copies of applications dated January 4, 2013, but the ALJ's
decision of February 2014 refers to applications dates December 12, 2012 and the claimant refers
to the second set of applications as the "2012 applications."  Rec. Doc. 6-1 at 141, 151, 235, 243.

[8]      Rec. Doc. 6-1 at 86-113.

[9]      Rec. Doc. 6-1 at 141-151.

the associated claims.[10]   In October 2014, the Appeals Council amended its order, noting that the court-ordered remand superseded the unfavorable decision of February 2014, and ordered that a new decision on the associated claims should be issued, consistent with the court's order.[11]   In November 2014, ALJ Ragona presided over a third administrative hearing regarding the associated applications for benefits.[12]   In February 2015, the claimant attended a post-hearing consultative examination by Dr. Casey Murphy.[13]   In July 2015, a supplemental administrative hearing regarding Dr. Murphy's testimony was held.[14]    In September 2015, ALJ Ragona issued an unfavorable decision.[15]   Under 20 C.F.R. § 404.984 and because of the earlier judicial remand, the September 2015 decision is the Commissioner's final administrative decision and no decision by the Appeals Council was required.  Therefore, the ALJ's decision of September 14, 2015 became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking review of the Commissioner's decision.

---

[10]      Rec. Doc. 6-1 at 156-158.

[11]      Rec. Doc. 15 at 58-59.

[12]      Rec. Doc. 15 at 642-668.

[13]      Dr. Murphy's report is found in the record at Rec. Doc. 15 at 531-539.

[14]      Rec. Doc. 6-1 at 33-46.

[15]      Rec. Doc. 6-1 at 11-26.

### SUMMARY OF PERTINENT FACTS

The claimant was born on January 16, 1976.[16]  When he filed his original application for benefits, he was thirty-four years old; he is now forty-one years old. He did not complete high school,[17] had no subsequent vocational training,[18] and has work experience as a carpenter, an oilfield roustabout, and a construction foreman for oilfield production facilities.[19]  He alleged in his applications that he has been disabled since April 21, 2010[20] due to back injury, neck injury, insomnia, asthma, anxiety, depression, carpal tunnel syndrome, and acid reflux disease.[21]

The claimant was injured in an offshore accident in 2001, when a high pressure pipe on the offshore oil well platform he was working on exploded and he was thrown against a set of handrails and held there for a period of time by the force of the escaping pressure, injuring his neck and low back.[22]  He had lumbar surgery with

---

[16]     Rec. Doc. 6-1 at 88, 164, 235; Rec. Doc. 15 at 273, 644.

[17]     Rec. Doc. 6-1 at 90; Rec. Doc. 15 at 645.

[18]     Rec. Doc. 6-1 at 90; Rec. Doc. 15 at 645.

[19]     Rec. Doc. 6-1 at 259, 279; Rec. Doc. 15 at 161, 645.

[20]     Rec. Doc. 6-1 at 235, 243; Rec. Doc. 15 at 273.

[21]     Rec. Doc. 6-1 at 116, 269.

[22]     Rec. Doc. 15 at 165-166.

internal hardware placement and bone grafting at L5-S1 by Dr. John Cobb in 2003.[23]
Although surgery on his neck was considered at that time, his cervical injury was not
as bad as his lumbar spine injury.[24]  After the lumbar surgery, the claimant returned
to work as a foreman in oilfield construction, doing less manual labor than he
previously had done.[25]

In August 2007,[26] the claimant began treating with Dr. Daniel L. Hodges, a
physician who is board-certified in the field of physical medicine and rehabilitation
and specializes in pain management.  At that time, the claimant complained of neck
pain, back pain, pain radiating into his bilateral upper and lower extremities, and
trouble sleeping due to pain.  His cervical spine range of motion was somewhat
limited, his lumbar range of motion was limited, he had positive Tinel's sign
(indicative of carpal tunnel syndrome), moderate pain with hyperextension of the
lumbar spine, and pain with lateral bending and rotation.  Dr. Hodges saw him
regularly thereafter, in November 2007, February 2008, June 2008, September 2008,
December 2008, March 2009, June 2009, July 2009, and October 2009.[27]  Dr. Hodges

---

[23]     Rec. Doc. 15 at 430.

[24]     Rec. Doc. 15 at 166-167.

[25]     Rec. Doc. 15 at 167.

[26]     Rec. Doc. 15 at 430-433.

[27]     Rec. Doc. 15 at 403-429.

described him as having persistent acute and chronic low back pain as well as depression and anxiety.

On January 21, 2010,[28] Dr. Hodges noted that the claimant's lumbar range of motion was diminished and that hyperextension and rotation to the left and right were painful.  He had significant paravertebral tenderness with spasm.  Dr. Hodges's impression was history of L3-4 lumbar fusion with persistent acute and chronic arachnoidopathy with leg, low back, and buttock pain.  The claimant stopped working in April 2010.[29]  When he visited Dr. Hodges on April 22, 2010,[30] the range of motion in his cervical spine was limited, he had tenderness throughout the trapezial levator groups into the rhomboid musculature, and a positive Tinel's sign.  He also had paravertebral tenderness extending from L1 to L5 described as persistent mechanical back pain.  Nerve conduction velocity studies on April 27, 2010 showed bilateral median nerve entrapment neuropathy at the level of the carpal tunnel, right greater than left.[31]  An MRI of the cervical spine taken on May 6, 2010 showed a small right lateral focal disc herniation at C3-4 with no definite cord or nerve root compromise

---

[28]     Rec. Doc. 6-1 at 334-336.

[29]     Rec. Doc. 15 at 169.

[30]     Rec. Doc. 6-1 at 337-339.

[31]     Rec. Doc. 6-1 at 340.

as well as minor central spondylosis at C4-5, 5-6, and 6-7.[32]  On May 17, 2010,[33] Dr.

Hodges adjusted the claimant's medication and referred him to a surgeon for further

assessment of his carpal tunnel syndrome and his cervical spine complaints.

The claimant was examined by Dr. Kenneth A. Ritter, Jr. at the request of

Disability Determination Services on June 25, 2010.[34]  Dr. Ritter's examination

revealed that the claimant had a normal gait and station.  Straight leg raises were

negative.  The range of motion in his upper and lower extremities was normal, and

he had normal grip strength bilaterally as well as normal deep tendon reflexes and

normal sensation.  He had a slightly positive Tinel's sign on the left.  Dr. Ritter

assigned lifting restrictions but no standing, walking, or sitting restrictions.

When the claimant returned to see Dr. Hodges in August 2010,[35] he was no

longer employed, and Dr. Hodges again found a restricted range of motion in his

cervical spine with significant associated tenderness and positive Tinel's signs.  His

examination of the claimant's low back revealed pain on extension, lateral bending,

and rotation.

---

[32]     Rec. Doc. 6-1 at 341.

[33]     Rec. Doc. 6-1 at 342-345.

[34]     Rec. Doc. 6-1 at 455-459.

[35]     Rec. Doc. 6-1 at 346-348.

On September 4, 2010, the claimant had a consultative examination with Dr. Eric R. Cerwonka, a clinical psychologist.[36] The claimant reported that he had received outpatient psychotherapy for about two months after his accident and had taken Xanax since 2006. Following examination, Dr. Cerwonka found him to be mildly depressed with a mildly restricted affect. He diagnosed Adjustment Disorder with Depressed Mood and Anxiety and assigned a GAF score of 67, which indicates mild symptoms.[37] He opined that the claimant's disorder "would not be expected to prevent Mr. Constantine from working." He also noted mild attention and concentration problems that he found secondary to the claimant's "chronic discomfort." He found that "there do not seem to be any psychiatric, cognitive, or behavioral problems that would prevent Mr. Constantine from engaging in regular, full-time work."

The claimant continued to treat with Dr. Hodges, visiting him on November 18, 2010, February 7, 2011, and May 19, 2011.[38] Dr. Hodges diagnosed him with progressive cervical disc disease at C3-4 as well as a history of multilevel lumbar spine surgery with acute and chronic arachnoidopathy and treated him with Xanax,

---

[36]     Rec. Doc. 15 at 462-464.

[37]     Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") at 32.

[38]     Rec. Doc. 6-1 at 349-358.

Hydrocodone, and Celebrex.  On June 17, 2011, Dr. Hodges filled out a medical source statement of ability to do work-related activities,[39] in which he opined that the claimant could frequently lift up to ten pounds, occasionally lift eleven to twenty pounds, and never lift more than twenty pounds; sit for thirty minutes without interruption; stand or walk for an hour without interruption; and sit and stand/walk for only one hour out of an eight-hour time period.  Dr. Hodges also indicated that the claimant would need unscheduled breaks during the work day; would need to miss work or leave work early approximately three times per month; and experienced drowsiness or sedation as a result of his prescribed medications.

On July 11, 2011, the claimant testified at the first administrative hearing.[40]  He testified that he was having low back pain and neck pain every day, and that the medication decreased his pain but did not make it completely go away.  He described his neck pain as worse than his low back pain, and stated that he was having headaches, trouble gripping with his hands due to carpal tunnel syndrome, and trouble sleeping due to the inability to find a comfortable position because of the pain.  He testified that Xanax makes him "zoned out."  He stated that he spends most of his time in a recliner or laying on the sofa.  He said he can shop for groceries with

---

[39]       Rec. Doc. 15 at 485-486.

[40]       Rec. Doc. 15 at 136-190.

his wife for only about one hour at a time and does very little around the house other than watch TV.  He testified that he has to change positions every thirty minutes to an hour.  More particularly, he testified that after sitting for about thirty minutes, he has to stand up or walk around due to pain, numbness, and tingling.  During the hearing, which lasted approximately an hour, he requested permission to stand up. He stated that his medication helps his pain but does not totally relieve it, reducing it from ten out of ten to four out of ten for his low back and six out of ten for his neck. He described a burning pain caused by sitting as well as numbness in his lower extremities if he sits too long.  He explained that he stopped working due to pain and the aggravation resulting from dealing with chronic pain after his employer began cutting back on employees and requiring the claimant to do more physical labor, increasing his pain and resulting in him taking more pain medication.

Dr. Hodges continued to see the claimant regularly, seeing him on August 25, 2011, December 5, 2011,March 28, 2012, July 11, 2012, and October 24, 2012.  In December 2011, it was noted that cervical surgery was being contemplated, and his medications were adjusted.  In October 2012, Dr. Hodges noted that an MRI revealed a significant C6-7 disc protrusion to the left with foraminal stenosis commensurate with his symptoms, which was a significant change from the May 2010 MRI.  On

December 21, 2012, Dr. Hodges opined that the claimant should not work due to disability.[41]

Between February 2011 and December 2012, the claimant also treated with Dr. Scott Bergeux, primarily for matters unrelated to the impairments underlying his claimed disability.  However, the claimant complained to Dr. Bergeux of neck and back pain on February 17, 2012, and Mobic was prescribed.[42]  On July 24. 2012, the claimant again complained to Dr. Bergeux of neck pain radiating to his left shoulder and reported that he was being followed for pain management.[43]  X-rays obtained the same date showed a normal cervical spine.[44]  The claimant again complained to Dr. Bergeux of neck pain on August 8, 2012.[45]  An MRI obtained on September 11, 2012 showed multilevel cervical spondylosis most significant at C6-7 with borderline central canal stenosis in association with left paracentral hard and soft disc complex and left neural foraminal stenosis related to uncovertebral joint hypertrophic change.[46]

---

[41]     Rec. Doc. 6-1 at 373.

[42]     Rec. Doc. 6-1 at 395-396.

[43]     Rec. Doc. 6-1 at 391-392.

[44]     Rec. Doc. 6-1 at 411.

[45]     Rec. Doc. 6-1 at 389-390.

[46]     Rec. Doc. 6-1 at 410.

On November 12, 2012, the claimant was examined by orthopaedic surgeon Dr. John B. Sledge, III.[47]  The claimant told Dr. Sledge about his workplace accident in 2002, that he was diagnosed with a disc herniation at C5-6 at that time, that he underwent anterior discectomy at L4-5 and L5-S1 with fusion in September 2003 as a result of that accident, and that he was seeing Dr. Hodges for pain management.  He also reported that he was in a motor vehicle accident on May 31, 2012 when he had to swerve to avoid debris in the road and his truck flipped over, landing on the roof and requiring the claimant to climb out the rear door.  Dr. Sledge noted that an MRI from September 2012 showed multilevel degenerative changes with disc bulging and herniation most notable at C6-7 on the left and midline bulging at C3-4 and C4-5 as well as areas of neural displacement at C5-6 and C6-7.  The claimant was complaining of headaches, blurred vision, and popping of the jaw as well as stiffness, swelling, muscle spasms, tingling, aching, sharp pain, weakness, burning, numbness, and soreness in the neck and back.  He reported that his symptoms increase with sitting, standing, flexion, lying down, and driving or riding in a vehicle.  He also complained of left shoulder pain, right shoulder pain, arm numbness, trouble sleeping due to pain, trouble writing, trouble using buttons, and dropping things.  He also complained of right leg pain with sitting.  Upon examination, Dr. Sledge found that

---

[47]     Rec. Doc. 6-1 at 375-378, 448.

the claimant held his head with a tilt to the right side.  His cervical spine showed a decreased range of motion and a loss of normal cervical lordosis.  Dr. Sledge diagnosed "degenerative cervical neck [sic] disease with disc bulging most notably at C5-6 and C6-7," bilateral upper extremity symptoms greater on the right than the left, and anterior left shoulder symptoms.  He recommended a cervical epidural steroid injection at the C7-T1 level.  On January 15, 2013, a C7-T1 interlaminar cervical epidural steroid injection was performed.[48]

On January 30, 2013, the claimant reported to Dr. Sledge that the injection provided 75% to 80% pain relief and an improvement in numbness, but he was still having headaches and shoulder pain on the left.  X-rays of his left shoulder revealed a Grade 1 acromioclavicular ("AC") joint separation in his left shoulder.  Dr. Sledge injected the left shoulder AC joint with Depo-Medrol, Marcaine, and Xylocaine, and he recommended physical therapy.

On February 4, 2013, Dr. Hodges continued the claimant's medications, which included Lortab for pain and Alprazolam for anxiety.[49]

---

[48]     Rec. Doc. 6-1 at 379, 474-475.

[49]     Rec. Doc. 6-1 at 456.

The claimant followed up with Dr. Sledge on March 13, 2013.[50]  He reported that he discontinued physical therapy because it was too painful, and he declined another shoulder injection because it did not help enough.  Surgical intervention for the cervical spine problems and for his carpal tunnel syndrome was discussed.

On April 27, 2013, the claimant was examined by Dr. Jacques Courseault at the request of Disability Determination Services.[51]  The claimant gave a history of the offshore accident, lumbar fusion, and planned cervical surgery.  He described dull, achy neck pain with radiating numbness and tingling in both hands associated with weakness.  He also described dull, achy back pain with radiation to the left leg.  He told Dr. Courseault that his neck and back pain were worse with standing and laying down and better with medications.  He also reported insomnia secondary to pain.  He stated that he was diagnosed with asthma following the offshore explosion due to chemical exposure, resulting in shortness of breath with activity that responds to medications.  He also stated that he has anxiety and depression resulting from the accident, but good benefit from medications.  He told Dr. Courseault that he has carpal tunnel syndrome with tingling and numbness in both hands causing him to drop things frequently.  He was unable to differentiate the carpal tunnel syndrome

---

[50]      Rec. Doc. 6-1 at 443-444.

[51]      Rec. Doc. 6-1 at 420-424.

-14-

from radiating neck pain.  Finally, he told Dr. Courseault that he has a history of acid reflux but gets relief with medication.  Upon examination, Dr. Courseault found a positive Tinel's sign bilaterally, pain with lumbar facet loading but negative straight leg raise and negative Spurling's sign.  The claimant's grip strength was normal, and he had no muscle asymmetry, atrophy, or involuntary movements; no structural deformity, effusion, swelling, or joint tenderness.  His gait was normal and he was able to rise from a sitting position without assistance, stand on tiptoes, tandem walk, bend, and squat without difficulty.  Dr. Courseault's impressions were cervical paraspinal spasm, chronic facetogenic low back pain, insomnia, asthma, anxiety, depression, bilateral carpal tunnel syndrome, and gastrointestinal reflux disease.  Dr. Courseault opined that the claimant should be allowed to alternate sitting and standing as needed to relieve his low back pain but should be able to sit, walk, and/or stand for a full work day and lift or carry objects without limitations.

On April 30, 2013, the claimant underwent anterior cervical discectomy and fusion at C6-7, performed by Dr. Sledge.[52]  Two weeks later, he saw Dr. Hodges, who stated that he seemed to be doing quite well in the early post-op stage.  Medications were adjusted.[53]  The same day, the claimant also followed up with Dr. Sledge, and

---

[52]     Rec. Doc. 6-1 at 431-436, 471-473.

[53]     Rec. Doc. 6-1 at 455.

he reported that his neck and arm pain were significantly improved but he had recurrent pain in the left AC joint.[54]

At his three month check-up with Dr. Sledge, on July 31, 2013,[55] the claimant reported significant improvement in his neck and arm pain since surgery. However, he reported persistent left shoulder AC joint pain. He was referred to Dr. Stubbs for left shoulder evaluation and possible surgical intervention.

On July 31, 2013, Dr. Hodges noted that the claimant was going quite well after cervical surgery, and his medications were adjusted.[56] Imaging of the claimant's left shoulder, obtained at Abbeville General Hospital on August 9, 2013, showed mild AC joint widening suggesting a Grade 2 AC joint separation.[57] An MRI of the left shoulder, obtained on August 15, 2013, showed no evidence of a rotator cuff tear but prominent AC joint changes compatible with trauma sequela.[58]

---

[54]     Rec. Doc. 6-1 at 429-430.

[55]     Rec. Doc. 6-1 at 427-428.

[56]     Rec. Doc. 6-1 at 454.

[57]     Rec. Doc. 6-1 at 461.

[58]     Rec. Doc. 6-1 at 460.

On September 10, 2013, Dr. Malcolm J. Stubbs operated on the claimant's left shoulder, performing left shoulder arthroscopy with arthroscopic subacromial decompression and distal clavicle excision.[59]

The claimant again saw Dr. Sledge on October 23, 2013.[60]  At that time, he was six months post cervical surgery.  Dr. Sledge noted that he was stable and had experienced improved neck pain and bilateral numbness and tingling.  Dr. Sledge also noted the claimant had improvement in shoulder pain and range of motion since the recent shoulder surgery.

The claimant also followed up with Dr. Hodges in October 2013[61] and January 2014.[62]  On January 8, 2014, Dr. Hodges filled out a second medical source statement,[63] again opining that the claimant could frequently lift up to ten pounds, occasionally lift eleven to twenty pounds, and never lift more than twenty pounds; sit for thirty minutes without interruption; stand or walk for one hour without interruption; but sit and stand/walk for only one hour out of an eight-hour time period.  Dr. Hodges also indicated that the claimant would need unscheduled breaks

---

[59]     Rec. Doc. 6-1 at 468-470.

[60]     Rec. Doc. 6-1 at 481-483.

[61]     Rec. Doc. 6-1 at 477-479.

[62]     Rec. Doc. 6-1 at 526-528.

[63]     Rec. Doc. 6-1 at 484-485.

every hour during the work day and would need to miss work or leave work early approximately three times per month.  Dr. Hodges also stated that the claimant is prescribed Hydrocodone, which causes drowsiness that would interfere with his ability to work.  Finally, Dr. Hodges opined that the level of pain experienced by the claimant would significantly interfere with his ability to maintain concentration, persistence, and pace as to work activities over a two-hour block of time.

Just two days later, on January 10, 2014, the claimant testified at the second administrative hearing.[64]  His testimony was largely consistent with that given at the first hearing.  He stated that he injured both his neck and his back in an offshore accident and that a subsequent motor vehicle accident worsened his neck injury.  He reviewed his surgical history, and he testified that the cervical surgery made a significant difference in his pain level but he was having renewed problems with his shoulder.  He was also continuing to have pain in his arms and hands, particularly on the right side.  He estimated that he could walk and stand about thirty minutes to an hour at a time, could sit about thirty minutes at a time, and could lift a maximum of twenty pounds.  He stated that he had trouble sleeping and daily headaches as well as trouble doing fine manipulative tasks such as writing.  He testified that his back pain is constant, daily pain that travels into both legs.  He said that sitting makes the

---

[64]        Rec. Doc. 15 at 86-113.

pain worse, while medication helps to alleviate the pain.  On a typical day, he watches TV and walks around the house.  He drives for about ten minutes once or twice a day, and he can carry light grocery bags.  He watches his children play basketball in the summer time.  He occasionally attempts to mow the lawn.  He stated that he can use a riding lawnmower for about twenty minutes at a time, taking approximately fifteen or twenty such sessions to mow his grass.  On bad days, he limits his activities.  He explained that he stopped working due to pain and being aggravated as a result of the pain, having fired several crew members during the last year he worked.

When Dr. Hodges again saw the claimant on April 7, 2014,[65] he opined that "[o]verall he is getting adequate relief with his Norco as currently prescribed."  On July 3, 2014,[66] Dr. Hodges noted that the claimant continued to have multiple peripheral complaints.  In Dr. Hodges's opinion, he was totally and permanently disabled.

On July 30, 2014, Dr. Hodges was deposed by the claimant's attorney.  He stated that he is board certified in physical medicine and rehabilitation, has practiced in Lafayette, Louisiana since 1987, and has been qualified as an expert in those fields

---

[65]     Rec. Doc. 6-1 at 523-525.

[66]     Rec. Doc. 6-1 at 520-522.

by courts.[67]  He is not a surgeon but treats patients with chronic pain issues.[68]  Dr.

Hodges confirmed that the records maintained by his practice show that the claimant

injured both his neck and his low back in the 2002 accident, Dr. Cobb performed

lumbar surgery in 2003, the claimant returned to work thereafter, then first saw Dr.

Hodges in 2007.[69]  Dr. Hodges testified that there were two sources for the claimant's

alleged back pain:  (1) mechanical issues involving movement of the ligamentous

structures and bony structures in his back and (2) arachnoidopathy, which is scar

tissue growing around the nerve roots, stretching them, and causing radicular

symptoms.  Dr. Hodges explained that when a patient has any residual issues relative

to a disc at L4-5, those problems are most pronounced when sitting since most of the

body weight transfers to that disc space when a person is sitting.[70]  Dr. Hodges also

explained that the claimant's automobile accident of 2012 worsened his neck

condition and resulted in surgery by Dr. Sledge.[71]  The surgery did not correct the

cervical problems at C3-4, which together with the claimant's carpal tunnel syndrome

---

[67]     Rec. Doc. 6-1 at 490.

[68]     Rec. Doc. 6-1 at 491.

[69]     Rec. Doc. 6-1 at 492-493.

[70]     Rec. Doc. 6-1 at 495.

[71]     Rec. Doc. 6-1 at 498.

is a source for the pain in his hands and forearms.[72]  Dr. Hodges confirmed that his opinions concerning the claimant's functional capabilities have not changed much over time.[73]  In his opinion, the claimant is not capable of maintaining neck flexion, i.e., looking down at a desk or computer monitor for more than about thirty to forty-five minutes;[74] that stooping or bending forward at the waist would cause the claimant to experience significant problems;[75] that chronic pain results in anxiety, depression, and being more prone to aggravation;[76] and that the claimant would need a job that permits him to sit or stand at will, change positions, and take unscheduled breaks to believe the pressure on his back.[77]

The claimant followed up with Dr. Hodges in October 2014,[78] and his medications were again adjusted.

---

[72]     Rec. Doc. 6-1 at 499.

[73]     Rec. Doc. 6-1 at 501.

[74]     Rec. Doc. 6-1 at 502.

[75]     Rec. Doc. 6-1 at 503.

[76]     Rec. Doc. 6-1 at 504.

[77]     Rec. Doc. 6-1 at 505-506.

[78]     Rec. Doc. 6-1 at 517-519.

The third administrative hearing was held on November 19, 2014.[79]  Once again, the claimant's testimony was consistent with his testimony in the two prior hearings.  He again testified that he stopped working because the pain was getting to be too much for him to handle, he was taking more medication, and he was easily angered and aggravated, resulting in his firing about ten to fifteen men in his final year of work.  He stated that his daily activities include watching TV, feeding two dogs and six chickens, and checking for eggs.  He occasionally took his son hunting or fishing for about thirty minutes at a time.  He stated that he can drive for about fifteen or twenty minutes before his back starts to bother him and his legs go numb. He stated that in the prior six months, he had mowed the lawn about four times, using a riding lawnmower, taking breaks, and spending the next day in bed.  He testified that the symptoms he had before his neck and shoulder surgery were recurring.  He was no longer taking medication for anxiety or depression.

An MRI of the claimant's left elbow was obtained on February 6, 2015 following an injury from a fall, and it revealed mild medial displacement of the ulnar nerve with subtle signal abnormality in the nerve.[80]

---

[79]     Rec. Doc. 15 at 642-668.

[80]     Rec. Doc. 15 at 545.

Another consultative examination was conducted on February 7, 2015 by Dr. Casey Murphy.[81]  Dr. Murphy examined the claimant and opined that the claimant should be able to sit, walk, and/or stand for a full work day.  In a medical source statement attached to his report, Dr. Murphy opined that the claimant's ability to lift, carry, sit, stand, walk, push, and pull are not affected by his impairments.

The claimant saw Dr. Sledge on March 18, 2015 for evaluation of his left elbow pain.[82]   An injection of Depo-Medrol, Marcaine, and Xylocaine was administered, and he was diagnosed with tennis elbow.

The claimant again saw Dr. Sledge on May 11, 2015.[83]  His elbow pain improved following the injection, but he complained of neck and back pain.  Straight leg tests were positive on both the left and right.

X-rays of the lumbar spine obtained on June 8, 2015 showed no acute abnormality.[84]  However, a lumbar spine MRI obtained on June 23, 2015 showed a broad-based disc bulge at L3-4 lateralizing slightly to the left with central stenosis and mild facet hypertrophy.[85]

---

[81]     Rec. Doc. 15 at 531-539.

[82]     Rec. Doc. 15 at 551-541.

[83]     Rec. Doc. 15 at 555-558.

[84]     Rec. Doc. 15 at 541.

[85]     Rec. Doc. 15 at 546.

The claimant saw Dr. Sledge again on July 13, 2015.[86]  Straight leg tests were again positive.  Dr. Sledge noted that the new disc herniation at L3-4, depicted in the recent MRI, will likely require surgery.

On July 23, 2015, a supplemental administrative hearing was held.[87]  Dr. Casey Murphy, the consultative examiner who saw the claimant on February 7, 2015, was questioned.  He testified that he received his medical license in 2014, was then in residency training, and has never been qualified as an expert witness.  He said that his examination of the claimant took about twenty-five to thirty minutes, with about one-third to one-half of that time spent on the claimant's medical history.  The only document he reviewed with regard to the claimant's medical history was a single MRI report from 2010.  He had no memory of the claimant, and explained that he performed fifteen to eighteen similar examinations per day, two days per month, for Disability Determination Services.

The claimant now seeks judicial review of the Commissioner's ruling.

---

[86]     Rec. Doc. 15 at 559-562.

[87]     Rec. Doc. 6-1 at 33-46.

# ANALYSIS

## A.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[88]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[89]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[90]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[91]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the

---

[88]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[89]     *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[90]     *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[91]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

evidence or substituting its judgment for that of the Commissioner.[92]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[93]   Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[94]

## B.   ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[95]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and

---

[92]      *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[93]      *Martinez v. Chater*, 64 F.3d at 174.

[94]      *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[95]      See 42 U.S.C. § 423(a).

is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[96]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[97]   A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[98]

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires an ALJ to determine whether the claimant

---

[96]     42 U.S.C. § 1382(a)(1) & (2).

[97]     42 U.S.C. § 1382c(a)(3)(A).

[98]     42 U.S.C. § 1382c(a)(3)(B).

-27-

(1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[99] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[100]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[101] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[102]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[103]

---

[99]    20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[100]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).  See, also, 20 C.F.R. § 404.1520(a)(4); *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988)).

[101]    20 C.F.R. § 404.1520(a)(4).

[102]    20 C.F.R. § 404.1545(a)(1).

[103]    20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps.[104]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[105]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[106]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[107]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.

## D.  THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since April 21, 2010.[108]  This finding is supported by substantial evidence in the record.

---

[104]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[105]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[106]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[107]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[108]    Rec. Doc. 6-1 at 13.

At step two, the ALJ found that the claimant has the following severe impairments:  degenerative disc disease of the cervical and lumbar spine, carpal tunnel syndrome, recurrent impingement of the left shoulder with acromioclavicular joint arthritis, and asthma.[109]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[110]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except that he can only lift and carry ten pounds occasionally and five pounds frequently; stand and walk two hours in an eight-hour day and sit six hours in an eight-hour day; perform no over-the-shoulder work; should not be exposed to pulmonary irritants; and can engage in frequent but not constant tasks of fingering and handling objects.[111]  The claimant challenges this finding.

---

[109]     Rec. Doc. 6-1 at 14.

[110]     Rec. Doc. 6-1 at 16.

[111]     Rec. Doc. 6-1 at 17.

At step four, the ALJ found that the claimant is not capable of performing his past relevant work.[112]

At step five, the ALJ found that the claimant was not disabled from April 21, 2010 through September 14, 2015 (the date of the decision) because there are jobs in the national economy that he can perform.[113]  The claimant challenges this finding.

## E.   THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred because (1) he did not properly evaluate the medical opinion evidence under controlling law, resulting in a residual functional capacity assessment that is not supported by substantial evidence and was reached through improper application of legal standards; and (2) he did not properly evaluate the claimant's residual functional capacity under controlling law, particularly due to the failure to include a sit/stand option in the assessment.

## F.   THE ALJ IMPROPERLY WEIGHED THE MEDICAL OPINIONS, RESULTING IN A FLAWED RESIDUAL FUNCTIONAL CAPACITY FINDING

The claimant primarily complains of pain, which he argues limits his ability to work.  Pain can constitute a disabling impairment[114] when it is constant, unremitting,

---

[112]     Rec. Doc. 6-1 at 24.

[113]     Rec. Doc. 6-1 at 25.

[114]     *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).

and wholly unresponsive to therapeutic treatment.[115]  Even when pain is not disabling on its own, however, it may constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.[116]  In evaluating a claimant's residual functional capacity, an ALJ must take into account a claimant's subjective allegations of pain and the claimant must produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged.[117]  In this case, it is undisputed that the claimant's lumbar spine and cervical spine injuries can produce the type of pain the claimant complains of.

The ALJ has sole responsibility for determining the claimant's disability status.[118]  Generally, the ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. The Social Security regulations and rulings explain how medical opinions are to be weighed.[119]  Although a treating physician's opinions are not determinative, the opinion of a treating physician who is familiar with the claimant's impairments,

---

[115]     *Falco v. Shalala,* 27 F.3d at 163; *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990).

[116]     See *Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).

[117]     *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

[118]     *Newton v. Apfel*, 209 F.3d at 455.

[119]     20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

treatments, and responses should be accorded great weight by the ALJ in determining disability.[120]  In fact, when a treating physician's opinions regarding the nature and severity of an impairment are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record, the ALJ must give those opinions controlling weight.[121]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[122]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[123]  Before declining to give any weight to the opinions of a treating doctor, an ALJ must also consider the length of treatment by the physician, the frequency of his examination of the claimant, the nature and extent of the doctor-patient relationship, the support provided by other evidence, the

---

[120]     *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008) (citing *Newton v. Apfel*, 209 F.3d at 455).

[121]     20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

[122]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

[123]     *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

consistency of the treating physician's opinion with the record, and the treating doctor's area of specialization, if any.[124]

In this case, the claimant has been treating with Dr. Hodges since 2007. Therefore, he treated with this same doctor for three years before his alleged disability onset date, and for at least five years thereafter.  Therefore, Dr. Hodges's opinions should have been given controlling weight unless there was good cause not to do so.  But the ALJ gave Dr. Hodges's opinions concerning the claimant's functional abilities, which were set out in two medical source statements, "little weight" and "no weight."[125]  The two earlier ALJ rulings were vacated because Dr. Hodges's opinions were improperly weighed.  This Court now finds that the ALJ also failed to properly weigh Dr. Hodges's opinions in the most recent decision.

The ALJ justified his decision to weigh Dr. Hodges's opinions as he did on the basis of consistency and supportability, finding that Dr. Hodges's opinions were not supported by the evidence and inconsistent with the claimant's testimony regarding his activities.  The ALJ's weighing of the medical opinion evidence resulted in a finding that the claimant has the residual functional capacity to perform sedentary work, with certain exceptions set forth in the ruling.

---

[124]   *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d at 456.

[125]   Rec. Doc. 6-1 at 22, 24.

Sedentary work requires that an individual be able to lift no more than ten pounds at a time and to walk or stand occasionally.[126] Thus, to perform the full range of sedentary work, a person must be able to remain in a seated position for approximately six hours out of an eight-hour work day, taking breaks only approximately every two hours.[127] Here, the ALJ expressly stated that he found the claimant capable of standing or walking for two hours in an eight-hour day and capable of sitting for six hours in an eight-hour day.[128] In Dr. Hodges's opinion, however, the claimant is capable of sitting for only thirty minutes without interruption, standing or walking for only an hour without interruption, siting for only one hour per eight-hour work day, and standing/walking for only one hour per work day. Therefore, had the ALJ given Dr. Hodges's opinion great weight or controlling weight, he would not have been able to conclude that the claimant could perform sedentary work, and he would have had to find the claimant disabled.

The ALJ reasoned that Dr. Hodges's opinions could not be given more weight because they were inconsistent with the claimant's activities. In particular, the ALJ

---

[126]    20 C.F.R. § 416.967(a).

[127]    SSR 96-9p. See, also, SSR 83-10 (specifying the total sitting that a full range of sedentary work requires); SSR 83-12 (specifying that the full range of sedentary work requires the ability to sit for prolonged periods of time).

[128]    Rec. Doc. 6-1 at 17.

noted that the claimant stated that he could feed two dogs and six chickens, gather the chickens' eggs, carry light grocery bags, take his children hunting, and mow the grass.  But there is no evidence that any of those activities require the claimant to sit for more than thirty minutes at a time, walk/stand for more than one hour at a time, sit for six hours in a day, or stand/walk for two hours in a day.  Therefore, the fact that the claimant engages in those activities does not establish that he can meet the sitting and walking/standing requirements of sedentary work.

For example, the claimant testified that when he took his son hunting, he did so for only about half an hour.  Further, he testified that mowing an acre and a half took a total of about three hours, which he divided up into twenty-minute segments with multiple breaks.  The ability to sit on a riding mower for twenty minutes at a time or even for three hours in a day on four occasions during a six month period does not mean that the claimant has the residual functional capacity to sit for three uninterrupted hours in an eight-hour work day, five days per week.  Therefore, the ALJ's suggestion that the ability to gather eggs, care for pets, and occasionally hunt or fish indicates that the claimant can stand and walk for two hours in a work day is speculative and unsupported by any evidence that the claimant spends that much time on those activities each day or that he has the functional capacity to do so.  Therefore,

the claimant's ability to perform the cited activities does not demonstrate that he is capable of performing sedentary work on a full time basis.

Furthermore, rather than focusing on whether the activities that the claimant stated he could perform are consistent with the medical testing and with Dr. Hodges's opinions, the ALJ suggested that the claimant lacks the motivation to work.  That conclusion is inconsistent with the fact that the claimant returned to work after injuring his low back and neck in the 2001 accident and only stopped working after he had already been treating with a pain management specialist for almost three years. Moreover, assessing a claimant's motivation is not among the criteria for deciding how to weigh medical opinion evidence.

With regard to the claimant's ability to lift and carry objects, the ALJ found the claimant's testimony that he can lift ten pounds to be credible and gave little weight to four doctors' opinions.  Dr. Murphy and Dr. Courseault found that the claimant had no limitations in lifting and carrying, Dr. Ritter found the claimant capable of lifting and carrying ten pounds frequently and twenty-five pounds occasionally, and Dr. Hodges found that the claimant could frequently lift up to ten pounds and occasionally lift eleven to twenty pounds.  The ALJ found, however, that the claimant can lift and carry only five pounds frequently and ten pounds occasionally, concluding that the claimant is more severely limited in this area than any doctor who

examined him.  The ALJ also concluded that the claimant should perform no work above the shoulder level even though "none of the physicians providing opinions in this case addressed the issue."[129]  These conclusions, while not prejudicial to the claimant, demonstrate that instead of weighing the various medical opinions in accordance with the Social Security Regulations and the applicable law, the ALJ substituted his own judgment for that of not one but four doctors.  "Although the ALJ may weigh competing medical opinions about. . . limitations and use objective medical evidence to support its determination that one opinion is better founded than another, neither the ALJ nor the court is free to substitute its own opinion."[130]  This was error, and it again indicates that the ALJ improperly weighed medical opinions, indeed disregarding them completely with regard to two specific functional findings included in the ALJ's residual functional capacity assessment.

With regard to the claimant's ability to sit, Dr. Ritter and Dr. Murphy opined that the claimant can sit without limitation; Dr. Courseault opined that the claimant can sit, stand, or walk for a full work day but would need to alternate sitting and standing at will to relieve his low back pain; and Dr. Hodges opined that the plaintiff

---

[129]     Rec. Doc. 6-1 at 23.

[130]     *Fabre v. Astrue*, No. 13-00076-BAJ-RLB, 2014 WL 4386424, at *6 n. 6 (M.D. La. Sept. 4, 2014).

can sit for only thirty minutes without interruption and can only sit for one hour in a work day.  The ALJ gave great weight to the opinions of Dr. Ritter and Dr. Murphy, some weight to Dr. Courseault's opinions, and implicitly gave no weight at all to Dr. Hodges's opinions in this regard.  In addition to discussing the claimant's activities, which this Court finds do not establish that the claimant can sit long enough to meet the requirements for sedentary work, as noted above, the ALJ justified his conclusion by noting the absence of positive straight leg raise tests and the absence of radicular symptoms into the lower extremities.  The ALJ said "[t]he absence of positive straight leg raises or radicular symptoms into the lower extremities. . . suggests that the claimant's ability to sit is not so limited that he would be unable to sit six hours in a workday, with the ability to stand at the normal meal break and rest periods which occur about every two hours throughout an eight-hour workday."[131]  The ALJ also found that those regular breaks would be sufficient opportunities for the claimant to change position over an eight-hour day.[132]

While it is true that the record contains no evidence of positive straight leg raise tests before 2015, the ALJ's conclusion that the claimant did not have radicular symptoms into his lower extremities is not supported by the evidence in the record.

---

[131]      Rec. Doc. 6-1 at 23.

[132]      Rec. Doc. 6-1 at 23.

To the contrary, the record is replete with references to radicular low back pain, starting with the claimant's first visit to Dr. Hodges when he reported "pain radiating into his bilateral upper and lower extremities."  In 2010 alone (the year in which the claimant contends that his disability began), the claimant complained to Dr. Hodges on numerous occasions of pain down the legs, numbness and weakness in his legs, and bilateral lower extremity pain.[133]   Furthermore, the claimant frequently complained that prolonged sitting caused his low back pain to intensify and led to radicular symptoms.[134]  For example, he testified that he can drive for only about fifteen or twenty minutes before his back starts to hurt and his legs go numb.[135]  At his deposition, Dr. Hodges explained, from a medical standpoint, that when a patient has residual issues related to a disc at L4-5, as the claimant does, those problems are most pronounced when sitting since most of the body weight transfers to that disc space when a person is sitting.[136]  Dr. Earl Beard, a non-examining medical professional who testified at the first administrative hearing, recommended that the

---

[133]     Rec. Doc. 6-1 at 335, 338, 342, 343, 346, 349, 350.

[134]     See, e.g., Rec. Doc. 6-1 at 103, 334, 337, 342, 346, 349, 352, 356, 359, 363, 366, 369, 376; Rec. Doc. 15 at 164, 176, 425, 414, 412, 409, 403.

[135]     Rec. Doc. 15 at 656.

[136]     Rec. Doc. 6-1 at 495.

claimant work only in jobs permitting a sit/stand option.[137]  That opinion was echoed by consulting examiner Dr. Courseault.[138]  Dr. Hodges's opinion that the claimant can sit for only thirty minutes without interruption implicitly incorporates a sit/stand requirement.  The ALJ found it significant that the claimant said he could mow his grass and drive a car,[139] but he discounted the claimant's testimony that mowing the grass results in him having to spend a day in bed recovering and that he can only drive for a few minutes with radicular pain.  This indicates that the ALJ failed to properly consider all of the record evidence, improperly picking and choosing only the evidence that supports his position.[140]   In summary, therefore, the ALJ's justifications for not giving Dr. Hodges's opinions great weight or controlling weight are not supported by substantial evidence in the record.

The ALJ also failed to address the issue of good cause for not giving Dr. Hodges's opinions great or controlling weight.  Dr. Hodges is the claimant's treating physician, he has treated the claimant since 2007, he routinely sees the claimant every three months, his treatment notes are internally consistent and consistent with the

---

[137]     Rec. Doc. 15 at 142.

[138]     Rec. Doc. 6-1 at 423.

[139]     Rec. Doc. 6-1 at 23.

[140]     *Loza v. Apfel*, 219 F.3d at 393.

opinions expressed in the two medical source statements, and he is board certified in fields related to the claimant's impairments as well as a specialist in the field of pain management, restricting his practice to treating patients with chronic pain.  There is no good cause to discount the weight of Dr. Hodges's opinions relative to any other expert whose opinions are included in the record.  As detailed above, Dr. Hodges's opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record.  Accordingly, this Court finds that the ALJ erred in failing to give Dr. Hodges's opinions concerning the claimant's functional abilities great weight or controlling weight.

Had the ALJ properly weighed the opinions of the claimant's treating physician, Dr. Hodges, there a realistic possibility that he would have found greater limitations than those set forth in his residual functional capacity assessment. Consequently, the procedural error casts doubt on the existence of substantial evidence to support the decision to deny benefits.   Therefore, the claimant's substantial rights were affected by the consideration and weight accorded to Dr. Hodges's opinions by the ALJ.  This procedural error was not harmless and warrants reversal of the Commissioner's decision.

## CONCLUSION AND RECOMMENDATION

As explained above, this Court finds that the ALJ failed to apply appropriate legal standards in ruling on this case, resulting in a decision that is not based on substantial evidence in the record.  Accordingly, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g), with instructions that the claimant's applications for Disability Insurance Benefits and Supplemental Security Income be granted and for computation and payment of an award of benefits for the time period beginning on April 21, 2010.

Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[141]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

---

[141]   See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir.1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 6th day of March 2027.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE